UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

JAMES HAMLIN & CO. PC,

        Plaintiff,

   v.                                  Case No. 18-cv-1705-pp

CZARNECKI & SCHLENKER, LLC,
MARC CZARNECKI, and TERRY SCHLENKER,

        Defendants,

   v.

CLAY HAMLIN,

        Counter-Defendant.

---

**ORDER DENYING PLAINTIFF'S AND COUNTER-DEFENDANT'S MOTION TO EXCLUDE EXPERT TESTIMONY (DKT. NO. 45)**

---

## I.    Procedural History

    A.    <u>Allegations in the Complaint</u>

The plaintiff filed the complaint on October 26, 2018. Dkt. No. 1. The plaintiff is an Illinois corporation; on December 29, 2015, it entered into an asset purchase agreement with the Wisconsin defendants to purchase substantially all the assets of defendant Czarnecki & Schlenker, a bookkeeping, tax preparation and accounting business. Id. at ¶¶1-4, 8-10. The agreement provided that in exchange for the assets of Czarnecki & Schlenker, the plaintiff agreed to pay an amount "equal to the gross receipts Czarnecki & Schlenker collected in the calendar year 2015 by providing bookkeeping,

1

income tax preparation, and accounting services to its clients (the "Business"), less any pre-billed or advance payments Czarnecki & Schlenker received from services to be performed after 2015." Id. at ¶10. The plaintiff promised that at closing, it would deliver to Czarnecki & Schlenker a promissory note equal to the purchase price minus $50,000 in previously-paid deposits; the note was secured by the assets of the Business and personally guaranteed by Clay Hamlin. Id. at ¶11. Interest accrued at a fixed annual rate of 3.25%, paid in installments over four years with the final payment due on June 1, 2020. Id.

The complaint alleged, however, that the purchase price could be adjusted in several ways, including increasing or decreasing the June 2020 final payment if the gross receipts of the Business in the first six months of 2017 increased or decreased by more than 10% as compared to the first six months of 2015. Id. at ¶12. The complaint alleges that that is what happened— that "[t]he gross receipts of the Business during the first six months of 2017 decreased by more than 10% when compared to the first six months of 2015." Id. at ¶13. The complaint asserts that based on this decrease, the plaintiff was "entitled to reduce the installment payment due on June 1, 2018 by $163,026." Id. at ¶14.

The complaint alleges that the plaintiff advised the defendants that it was entitled to the decrease, but that the defendants "wrongfully denied that [the plaintiff] was entitled to reduce the June 1, 2018 installment payment." Id. at ¶¶15-16. The complaint says that because the parties were unable to reach an agreement, the plaintiff paid the full amount of the June 2018 installment

2

payment ("in order to avoid default under the terms of the asset purchase agreement"), but advised the defendants that it was going to seek an adjustment of that payment. Id. at ¶17.

    B.    <u>Subsequent Procedural Developments</u>

On December 21, 2018, the defendants answered the complaint. Dkt. No. 11. They also filed a counterclaim against the plaintiff, dkt. no. 12, and filed a motion seeking to added counterclaim-defendant Clay Hamlin, dkt. no. 13. The counterclaim alleges a single count of breach of contract, based on the plaintiff's failure to comply with the term of the promissory note requiring payment of the full amount of the June 1, 2017 payment. Dkt. No. 12 at 2-4. The plaintiff and the counter-defendant answered the counterclaim on January 7, 2019. Dkt. No. 14. The defendants then sought leave to file a supplemental and amended counterclaim on July 24, 2019, dkt. no. 19; they filed that supplemental and amended counterclaim on August 21, 2019, dkt. no. 21. The plaintiff and counter-defendant filed an answer to the amended counterclaim on August 27, 2019. Dkt. No. 22.

The parties filed a joint Rule 26(f) plan on September 11, 2019. Dkt. No. 2019. The court issued a scheduling order two days later. Dkt. No. 27. It amended this order on May 22, 2020 by stipulation of the parties. Dkt. Nos. 28, 29. The court amended the order twice more by stipulation, first on July

10, 2020 and again on October 1, 2020. Dkt. Nos. 30-33. In the October 1

order, the court set a February 28, 2020 deadline for filing <u>Daubert</u> motions.[1]

On February 25, 2021, the plaintiff and counter-defendant filed a motion

under Fed. R. Evid. 702 to exclude the testimony of the defendants' expert

witness, Fred Sitzberger. Dkt. No. 45. The plaintiff and counter-defendant

attached Sitzberger's report to their motion. Dkt. No. 47-1.

## II.   Expert Report

On November 30, 2020, Sitzberger sent the defendants a copy of his

report. Dkt. No. 47-1 at 3. The first paragraph of the report states that at the

request of the defendants, Sitzberger had prepared a report

> outlining [his] opinion as to whether [the plaintiff] (the buyer)
> exercised good faith and acted timely in the Asset Purchase
> Agreement, paragraph 4(F), specifically, "Buyer shall complete work,
> bill work and collect invoices in good faith and timely". This relates
> to a price adjustment up or down if the receipts increase or decrease
> by more than 10% over the first six months of 2015.

<u>Id.</u> at 3.

> Sitzberger then provided his opinions:
>
> It is my opinion that [the plaintiff] did not complete work, bill work
> and collect invoices in good faith and timely and therefore the
> purchase price should not be reduced according to the asset
> Purchase Agreement, paragraph 4(F). The remainder of this report
> provides detail supporting this opinion.
>
> In addition, it is my opinion that the revenues did not decline by
> more than 10% of the measurement amount appearing on page 10
> of 10 of the Collections C&S Clients report, as specified by
> paragraph 4(F) of the Asset Purchase Agreement. From [Clay
> Hamlin's] own analysis of the underpayment, all things being the

---

[1] The court amended the scheduling order again on March 26, 2021, dkt. no.
52, but this occurred after the plaintiff had filed the pending <u>Daubert</u> motion.

4

same, the practice receipts are $9,235.56 in excess of the minimum and no adjustment is necessary.

| | |
|---|---|
| Balance per Hamlin report | $550,062.64 |
| Billed and paid late | 68,829.14 |
| Work done slowly | 7,219.10 |
| Mixed reasons | 4,904.54 |
| Reported late | 12,755.00 |
| Carved out clients | 5,588.14 |
| | 650,358.56 |

| | | |
|---|---|---|
| Measurement amount | 712,358 | |
| Less 10% | (71,235) | |
| | | 641,123.00 |

Excess over measurement amount less 10% $9,235.56

The above illustrates through [Clay] Hamlin's own analysis the reduced cash receipts are due to his own mismanagement. Nonetheless, the reduction is still less than the 10% specified in the Asset Purchase Agreement.

Id. at 1-2.

The next section of the report was titled "Analysis of successful client retention." Id. at 4. This section explained that Sitzberger's company, Sitzberger & Company, S.C., had "purchased twenty firms over twenty five years and is projected to have ten million in sales through December 31, 2020." Id. It asserted that, based on this experiences and the company's retention of new clients, the company had "developed methods for retaining and growing the client revenues, profits and our practice in general." Id. Sitzberger said that "[a]mong these methods are the following:"

5

1.    Complete all work on a timely basis to develop personal relationships with the clients.

2.    Keep all employees including the owners for as long as they want at a fixed salary.

3.    Keep all billing practices and prices the same for at least eighteen months. After the relationship is created increases in price and billings are acceptable.

4.    Avoid purchasing a practice greater than 25% of your current practice. This will strain your current personnel and reduce revenue across the global practice due to personnel limitations, further creating a negative cash flow.

Id. at 4.

The next section of the reported is titled "Adherence to principles of successful purchase practices and differences noted." Id. at 5. In this section, Sitzberger analyzed the defendant's work under the four methods his firm had developed. First, based on customer complaints provided by the defendant's principles, Sitzberger concluded that Czarnecki & Schlenker did not complete work on a timely basis. Id. at 5. Second, he observed that Clay Hamlin had terminated three employees on March 21, 2016, and that on December 5, 2016, James Hamlin had reported that they were short six employees to help at tax season and that the "bookkeeping core is thin and anxious." Id. Sitzberger opined that this "contributed to late reports and tax returns that would otherwise have been completed and payment received during the measurement period." Id. Third, Sitzberger opined that the plaintiff's billing practices differed from Czarnecki & Schlenker's in two areas: the plaintiff did not charge service charges for late payments and the plaintiff did not keep track of "their" time (which Sitzberger asserted was an industry standard practice). Id. Sitzberger

6

concluded that these differences in billing practices resulted in a reduction in cash receipts of $100,297.38. Id. Fourth, Sitzberger stated the following regarding whether the plaintiff had purchased a practice greater than 25% of its current practice:

> [The plaintiff's] 2015 revenues were $3,543,606.00, 25% of this is $885,901.00. The Czarnecki & Schlenker revenues for the year prior to the purchase were $1,154,401 or 32% of the [plaintiff's] revenues. This created cash flow problems.
>
> From my review of the [plaintiff's] 2015 corporate 1120 tax return page 4 the company had just $205,843.00 of cash in the company. The lack of capital was likely the reason [the plaintiff] had to release [three employees] on March 21, 2016 and changing employee duties. This started the snowball of poor customer service, late returns and poor collections for the January 1 through June 30, 2017 measurement period. No new employees were added during this period to do the work of the terminated employees.

Id. at 6.

In the next section of the report, titled "Reason for Price Adjustment Clause," Sitzberger provided his opinion of why purchase agreement usually contain price adjustment clauses. He opined:

> Usually the clause for the price adjustment is to account for clients that leave the accounting practice after transfer of ownership. It is generally not intended for revenue reductions caused by work that was delayed and not competed timely due to management of the purchasing firm and personnel deficiencies.
>
> The buyer (Hamlin) can easily manipulate cash receipts to garner an unjust enrichment by delaying work and billing late. Timely is in the client's eyes and service should be the same with the new firm as with the old. With this standard, Hamline [sic] did not complete work and collect invoices timely.

Id.

7

Finally, Sitzberger included a section titled "Other Items." Id. In this section, Sitzberger asked Czarnecki & Schlenker to provide him "the collections" for the first six months of 2013 and 2014; the report does not indicate whose collections he received. Id. Those collections—$752,266 for 2013 and $716,305 for 2014—caused him to conclude that, "[a]s you can see from above the last two years haven't materially changed from the original measurement period of January 1, 2015 through June 30, 2015 of $712,358. And, as shown previously, the cause of any reductions was the failure of [the plaintiff] to 'complete work, bill work and collect invoices in good faith and timely.'" Id.

The report included an analysis of customer complaints (id. at 8, 12-28), and a mathematical calculation of the decline in revenues using a database provided by the plaintiff and counter-defendant. Id. at 29-39. He also considered discovery responses, id. at 40-71, and the asset purchase agreement itself, id. at 73-89.

## III. The Parties' Arguments

The plaintiff asks the court to exclude Sitzberger's expert testimony. Dkt. No. 46. It asserts that Sitzberger's only qualifications are his experience purchasing twenty public accounting firms and his authorship of an article on his website. Id. at 9. It argues that Sitzberger never has testified as an expert in a case involving the purchase of one accounting firm by another. Id. The plaintiff alleges that Sitzberger himself does not follow the four "principles," or methods, testifying at his deposition that he normally changes billing rates

8

when he purchases a practice. Id. at 10. It asserts that Sitzberger also purchased a practice for more than 25% of his current practice. Id.

The plaintiff argues that Sitzberger's methodology is unreliable, because his four "principles" or methods do not come from any authoritative publication and do not have general acceptance in the accounting firm community. Id. at 10-11. It argues that at his deposition, Sitzberger testified that his principles came from "good business sense" and that he'd probably forgotten where he got all his ideas. Id. at 11. The plaintiff emphasizes that Sitzberger's principles are not testable and have not been subjected to peer review, and that the only article on which Sitzberger relied to support his opinions is "an unattributed post on the website of a company that assists with the buying and selling of accounting firms." Id.

Last, the plaintiff argues that application of Sitzberger's flawed methodology to the facts of the case is unreliable. Id. at 12. The plaintiff asserts that Sitzberger "previously held opinions about how to successfully purchase accounting firms and looked for evidence to see if [the plaintiff's] purchase of Czarnecki & Schlenker fit his opinions." Id. The plaintiff argues that Sitzberger basically found facts to fit an opinion, rather than forming an opinion from facts. Id. It asserts that Sitzberger did not review complete data. Id. at 13. And it argues that Sitzberger misunderstood the context of the data he used to perform his mathematical calculations. Id.

The defendants respond that an individual can be qualified to render an expert opinion based solely on experience. Dkt. No. 49 at 3. They note that Clay

Hamlin plans to offer an expert opinion and they posit that "[t]he only way to become an expert on acquiring accounting practices and managing an accounting practice is through experience," asserting that "[t]here are no degrees in acquiring accounting practices and there is no wealth of scholarly work on the topic." Id. at 4. They assert that in addition to his experience acquiring accounting practices, Sitzberger has attended seminars and spoken with colleagues and acquaintances in the profession, and that he has "created, refined, and tested the principles in his own practice for the past 25 years." Id. The defendants asserted that it is undisputed that as a CPA, Sitzberger is qualified to analyze documents and perform the calculations he performed for his report. Id. at 5.

As to the plaintiff's attacks on Sitzberger's credibility, the defendants argue that credibility is a determination for the jury. Id.

The defendants argue that "[m]ethodologies do not have to be written in a textbook to be reliable." Id. at 6. They assert that "[r]eliable methodologies can . . . be derived from direct experience." Id. The defendants argue:

> Sitzberger testified the principles underlying his report are prudent business practices developed over many years after communicating with other successful accountants and attending seminars. *See* Sitzberger Dep. (filed as ECF No. 47-2) at 47-48. He also created, refined, and tested the principles in his own practice for the past 25 years, through his direct experience acquiring and managing accounting practices. *See id.* at 45-46; ECF No. 47-1 at 10. He oversees a successful accounting firm with 41 CPAs. Sitzberger Dep. (filed as ECF No. 47-2) at 45. This all shows the principles and methodologies relied upon by Sitzberger have been tested by him and other accountants and have been widely accepted within the accounting profession.

Id.

The defendants also assert that Sitzberger's application of his principles is reliable. They characterize the plaintiff's "have an opinion then review facts to see if they fit it" argument as "nonsense," asserting that "[i]t is hard to imagine any other way to reach a conclusion." Id at 7. They dispute that Sitzberger formed his opinion about the acquisition in this case before looking at the facts, only that he had opinions about general principles for acquiring accounting practices before looking at the facts. Id. As to the fact that Sitzberger did not have all the documents he needed to form an opinion, the defendants argue that this is the plaintiff's fault. Id. They assert that it was the plaintiff that failed to produce requested tax return documents, pointing out that in March, the court granted a motion to compel production of those documents. Id. (citing Dkt. No. 48). They assert that when the plaintiff produces the documents, they will ask Sitzberger to review them ahead of trial and the plaintiff's counsel can ask Sitzberger whether the documents change his opinions. Id. at 7-8.

Regarding Sitzberger's use of Clay Hamlin's spreadsheet to perform his mathematical calculations concluding that the revenues did not decline by more than 10% in the first year after acquisition, the defendants argue that Sitzberger did not arrive at that opinion based on Hamlin's spreadsheet alone. Id. at 8. They assert that Sitzberger also conducted an independent calculation of the "additional revenue [the plaintiff] would have received had it charged late fees and charged for its employees' time in good faith just as C&S had always done." Id. They assert, however, that there is nothing wrong with using the

11

opposing party's data to inform an expert opinion, and that the spreadsheet speaks for itself. Id. The defendants argue that the plaintiff has not pointed to anything inaccurate about the data in the spreadsheet, opining that the plaintiff complains only that Sitzberger didn't obtain and review the raw data (something they say Hamlin didn't do, either). Id. at 9.

Finally, they argue that Sitzberger's opinion "unquestionably" would assist the trier of fact in its analysis, stating that "[e]ven [the plaintiff] concedes this step of the three-step process to evaluate expert testimony is satisfied." Id.

The plaintiff reiterates that Sitzberger's qualifications come from his experience and that he has not followed his own principles. Dkt. No. 53 at 3. It emphasizes that "[t]here is no suggestion that the accounting community, let alone Sitzberger himself, generally accepts his four principles methodology." Id. at 4. It characterizes this "circular logic—Sitzberger developed the four principles through experience, and his experience shows that the methods are reliable" as "a textbook example of the type of experiential expertise Rule 702 seeks to preclude by requiring general acceptance in the profession." Id. at 5. And they argue that whether Sitzberger did his mathematical calculations using Hamlin's spreadsheet or using his own "third" principle, the application of his methods to the facts of the case is unreliable. Id. at 7-9.

## IV. Analysis

### A. Applicable Law

Federal Rule of Evidence 702, <u>Daubert v. Merrell Dow Pharmaceuticals</u>, 509 U.S. 579 (1993) and <u>Kumho Tire Co., Ltd. v. Carmichael</u>, 526 U.S. 137 (1999), govern the admissibility of expert testimony.

Rule 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify int eh form of an opinion or otherwise if:

**(a)** the expert's scientific, technical, or otherwise specialized knowledge will help the trier of fact to understand the evidence or to determine a fact at issue;

**(b)** the testimony is based on sufficient facts or data;

**(c)** the testimony is the product of reliable principles and methods; and

**(d)** the expert has reliably applied the principles and methods to the facts of the case.

The court, as gatekeeper, "is responsible for ensuring that proposed expert testimony 'is not only relevant, but reliable.'" <u>Timm v. Goodyear Dunlop Tires N. Am., Ltd.</u>, 932 F.3d 986, 993 (7th Cir. 2019) (quoting <u>Daubert</u>, 509 U.S. at 589). "In assessing reliability, 'the role of the court is to determine whether the expert is qualified in the relevant field and to examine the methodology the expert has used in reaching his conclusions.'" <u>Id.</u> (quoting <u>Smith v. Ford Motor Co.</u>, 215 F.3d 713, 718 (7th Cir. 2000)).

This determination requires to court to engage in a three-step analysis. "It must determine whether the witness is qualified; whether the expert's

methodology is scientifically reliable; and whether the testimony will 'assist the trier of fact to understand the evidence or to determine a fact in issue." Gopalratnam v. Hewlett-Packard Co., 877 F.3d 771, 779 (7th Cir. 2017) (citing Myers v. Ill. Cent. R.R. Co., 629 F.3d 639, 644 (7th Cir. 2010) (internal quotation marks omitted). The Seventh Circuit has clarified that "the district court must evaluate: (1) the proffered expert's *qualifications*; (2) the *reliability* of the expert's methodology; and (3) the *relevance* of the expert's testimony." Id. (emphasis in original). It is the burden of the party seeking to introduce an expert to show that they meet the Daubert standard. Id. at 782.

Rule 702 indicates that an expert witness may be qualified as an expert "by knowledge, skill, experience, training or education." An expert need not have particular academic credentials to be qualified; "anyone with relevant expertise enabling him to offer responsible opinion testimony helpful to judge or jury may qualify as an expert witness." Tuf Racing Prods, Inc. v. Am. Suzuki Motor Corp., 223 F.3d 585, 591 (7th Cir. 2000).

To be relevant for purposes of Rule 702, the testimony must assist the trier of fact to understand the evidence or to determine a fact in issue. Relevant evidence is evidence "that has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Daubert, 509 U.S. at 587 (quoting Fed. R. Evid. 401). "Where an expert's hypothetical explanation of the possible or probable causes of an event would aid the jury in its deliberations, that testimony satisfies *Daubert's* relevancy requirement." Smith, 215 F.3d at

718-19. If an expert uses hypothetical explanations for causes of an event, those hypotheticals must have "analytically sound bases," rendering them "more than mere 'speculation' by the expert." Id. at 719 (quoting DePaepe v. Gen. Motors Corp., 141 F.3d 715, 720 (7th Cir. 1998)). The question of whether the expert's theory is correct given the circumstances of a particular case is a factual one left for the jury to determine.

The Daubert court described a set of factors the trial court can consider when determining if a scientific expert's opinion is reliable:

> (1) "whether [the expert's theory or technique] can be (and has been) tested";
> (2) "whether the theory or technique has been subjected to peer review and publication";
> (3) "the known or potential rate of error"; and
> (4) "general acceptance" in the "relevant scientific community."

Daubert, 509 U.S. at 593–94.

In Kumho Tire, the Supreme Court held that the court's gatekeeping obligation applies to all expert testimony, not just scientific testimony. Kumho Tire Co., Ltd., 526 U.S. at 147. It noted, however, that the Daubert factors for evaluating an expert's theory or methodology were "meant to be helpful, not definitive." Id. at 151.

> Indeed, those factors do not all necessarily apply even in every instance in which the reliability of scientific testimony is challenged. It might not be surprising in a particular case, for example, that a claim made by a scientific witness has never been the subject of peer review, for the particular application at issue may never previously have interested any scientist. Nor, on the other hand, does the presence of Daubert's general acceptance factor help show that an expert's testimony is reliable where the discipline itself lacks reliability, as, for example, do theories grounded in any so-called generally accepted principles of astrology or necromancy.

15

Id.

That said, the <u>Kumho Tire</u> Court found that "some of *Daubert's* questions can help evaluate the reliability even of experience-based testimony." <u>Id.</u>

> In certain cases, it will be appropriate for the trial judge to ask, for example, how often an engineering expert's experience-based methodology has produced erroneous results, or whether such a method is generally accepted in the relevant engineering community. Likewise, it will at times be useful to ask even of a witness whose expertise is based purely on experience, say, a perfume tester able to distinguish among 140 odors at a sniff, whether his preparation is of a kind that others in the field would recognize as acceptable.

Id.

The <u>Kumho Tire</u> court stated that "no one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience." <u>Id.</u> at 156. <u>See also</u>, <u>Metavante Corp. v. Emigrant Sav. Bank</u>, 619 F.3d 748, 761 (2010) ("An expert's testimony is not unreliable simply because it is founded on his experience rather than on data; indeed, Rule 702 allows a witness to be 'qualified as an expert by knowledge, skill, *experience*, training or education.'" Emphasis added); <u>Ford Motor Co.</u>, 215 F.3d at 718 ("While 'extensive academic and practical expertise' in an area is certainly sufficient to qualify a potential witness as an expert, *Bryant v City of Chicago*, 200 F.3d 1092, 1098 (7th Cir. 2000), 'Rule 702 specifically contemplates the admission of testimony by experts whose knowledge is based on experience,' *Walker* [*v. Soo Line R.R. Co.*, 208 F.3d 581] at 591 [(7th Cir. 2000)]").

Indeed, "'[o]rdinarily, courts impose no requirement that an expert be a specialist in a given field.'" Hall v. Flannery, 840 F.3d 922, 929 (7th Cir. 2016) (quoting Gayton v. McCoy, 593 F.3d 610, 618 (7th Cir. 2010)). "The fact that an expert may not be a specialist in the field that concerns her opinion typically goes to the weight to be placed on that opinion, not its admissibility." Id. (citations omitted). Rule 702 requires "an expert's testimony to have 'a reliable basis in the knowledge and experience of [the relevant] discipline." Estate of Stuller v. U.S., 811 F.3d 890, 896 (7th Cir. 2016) (quoting Kumho Tire, 526 U.S. at 149).

Generally, "experience without reliable, testable methodology is not sufficient." Brown v. Burlington N. Santa Fe Ry. Co., 765 F.3d 765, 776 (7th Cir. 2014). "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." General Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997). "Reliability . . . is primarily a question of the validity of the methodology employed by an expert, not the quality of the data used in applying the methodology or the conclusions produced." Manpower, Inc. v. Ins. Co. of Penn., 732 F.3d 796, 806 (7th Cir. 2013).

The Seventh Circuit, however, has "repeatedly" allowed expert testimony based on experience and training "without requiring 'scientific methodologies' or 'peer review.'" United States v. Parkhurst, 865 F.3d 509, 516 (7th Cir. 2017) (citing United States v. Conn, 297 F.3d 548, 555-56 (7th Cir. 2002) (collecting cases)). In cases involving law enforcement officers as experts (usually criminal

17

Case 2:18-cv-01705-PP   Filed 10/18/21   Page 17 of 30   Document 64

cases), district courts "may review factors such as the officer's years of experience and number of investigations." Id.

Finally, "'Rule 702's requirement that the district judge determine that the expert use reliable methods does not ordinarily extend to the reliability of the conclusions those methods produce—that is, whether the conclusions are unimpeachable.'" Id. (quoting Stollings v. Ryobi Technologies, Inc., 725 F.3d 753, 765 (7th Cir. 2013)). The judge may not usurp the role of the jury by ruling on the reliability of the proposed expert's conclusions.

B.     Application of the Law to the Facts

1.     *Is Sitzberger Qualified?*

Sitzberger's *curriculum vitae*, found at the end of his expert witness report, indicates that he earned a Bachelor of Business Administration specializing in accounting from the University of Wisconsin, Milwaukee in 1978. Dkt. No. 47-1 at 118. He began his career at Ernst & Whinney[2], working as an auditor from 1978 through 1984. Id. In 1981—during his time at Ernst & Whinney—Sitzberger became a certified public accountant. Id. The CV indicates that from 1985 to 1989, Sitzberger was "Chief Financial Officer Industry;" it does not identify a company or employer during this period. It indicates that from 1989 to the present, Sitzberger worked in "Public Accounting, specializing in closely held small business accounting, consulting and valuations." Id. He became a certified valuation analyst in 1996. Id. While

---

[2] Ernst & Whinney merged with Arthur Young to become what is now Ernst & Young. https://www.ey.com/en_us/diversity-inclusiveness/pathways-to-progress.

the CV does not indicate when Sitzberger began what defense counsel referred to as "Sitzberger and Company,"[3] Sitzberger testified at his January 12, 2021 deposition that he had successfully purchased twenty practices, that he had seventy personnel and forty-one CPAs and that the company had just under $10 million in sales. Dkt. No. 47-2 at 12, Trans. Page 44 at line 25 through Page 45 at lines 1-5. He testified that he had made twenty acquisitions businesses in twenty-five years. Id. at 13, Trans. Page 46 at lines 1-3.

In a section of the expert witness report titled "Compliance with Court Rules," Sitzberger wrote that he had authored an article on "our website that you have to 'Love the Problems.'" Dkt. No. 47-1 at 10. During his January 2021 deposition, Sitzberger testified that he "did" an article for The Business Times about two years prior. Dkt. No. 47-2 at 13, Trans. Page 48 at lines 22-25 through Page 49 at lines 1-2.

The CV indicates that Sitzberger belongs to several professional organizations, including the Wisconsin Institute of Certified Public Accountants (which awarded him its community service award in 1999), the American Institute of Certified Public Accountants and the National Association of Certified Valuation Analysts. Dkt. No. 47-1 at 118. He is an exam proctor and grader for the latter. Id. He lists involvement with several local service organizations, and has acted as a board member or officer for several of them—

---

[3] The expert witness report, dated November 30, 2020, has a letterhead of "Sitzberger, CPAs and Business Advisors." Dkt. No. 47-1 at 3. The signature block, under which Sitzberger's signature appears, reads, "Sitzberger & Company, S.C." Id. at 7.

the Elmbrook Rotary, the Brookfield Chamber of Commerce, Hebron House, Elmbrook Hospital Foundation, Waukesha Symphony, Brookfield Senior Taxi, University of Wisconsin-Milwaukee alumni association (he received the distinguished alumni service award in 2020), University of Wisconsin-Milwaukee Foundation and the Potawatomi Boy Scouts. Id. He received the Brookfield Business Person of the Year Award in 2002. Id.

In the "Compliance with Court Rules" section of the CV, Sitzberger indicates that as an expert witness, he will opine on "whether [the plaintiff] completed work, billed work and collected invoices in good faith and timely." Dkt. No. 47-1 at 10. His twenty-five years of experience acquiring accounting firms and the number of firms he has acquired (twenty as of the time of the deposition) demonstrate that he has significant experience in acquiring accounting firms, the activity that gave rise to the allegations in this case. He testified at his deposition that his company had been successful and had remained viable throughout this growth, indicating that he has acquired accounting firms successfully. Sitzberger has sufficient experience in a field relevant to the issues in controversy to qualify him as an expert in what one might call the "best practices" for acquiring accounting firms and whether the plaintiff followed such practices.

The plaintiff and counter-defendant argue that Sitzberger never has testified in a case involving the acquisition of one accounting firm by another. Dkt. No. 46 at 9. Sitzberger admitted this at the deposition, and it appears from his deposition testimony that he never has testified as an expert witness

20

in an accounting matter. Dkt. No. 47-2 at 3, Trans. Page 8 at lines 1-19. This fact alone does not render Sitzberger unqualified to testify as an expert. He may not have experience as a *witness*, but he has experience acquiring accounting firms. Neither do the facts that he has not published articles on his "principles" render him unqualified. Like the law enforcement witnesses the Seventh Circuit referenced in <u>Parkhurst</u> and <u>Conn</u>, Sitzberger's qualifications arise from his practical experience, not from academic credentials. And he does not propose to testify to scientific facts that can be verified empirically; he proposes to give an opinion about whether the plaintiff acted in good faith in billing and collection after acquiring the defendant based on his own experiences in acquiring accounting practices.

The plaintiff and counter-defendant argue that because Sitzberger has violated his own principles, or "best practices," and argue that because his actions contradict his professed practices, the court should not qualify him as an expert. Dkt. No. 46 at 9-10. They assert that Sitzberger testified in his deposition that he normally changes billing rates upon acquisition of a practice—a violation of his third "principle" that the acquiring firm should keep billing rates the same for at least eighteen months. <u>Id.</u> at 10 (citing dkt. no. 47-2 at 19). They included with their motion a document showing that in December 2020, the Wisconsin Accounting Examining Board reprimanded Sitzberger for increasing the hourly billing rate for an employee who had joined Sitzberger & Co. from another accounting firm, then had charged a client the increased rate for work done before the date on which the employee joined

Sitzberger & Co. Dkt. No. 47-3 at 3. They assert that Sitzberger also violated his fourth principle—not to pay more than 25% of one's own value for an acquisition. Dkt. No. 46 at 10. They point to Sitzberger's January 2021 deposition testimony, in which he testified that he had purchased an accounting firm that was 50% of his firm's size. Dkt. No. 47-2 at 14, Trans. Page 52 at lines 10-13.

These criticisms do not mandate the conclusion that Sitzberger is not qualified to testify as an expert. They go to his credibility and to the weight a jury might give his expert testimony. If the case goes to trial, the plaintiff and counter-defendant will have the opportunity to cross-examine Sitzberger about his alleged failures to follow his own principles.

The court concludes that Sitzberger is qualified to testify as an expert about whether the plaintiff completed work, billed and collected invoices in good faith and in a timely manner.

2.   *Is Sitzberger's Methodology Reliable?*

Sitzberger's "methodology" consists of his four principles, gleaned from his years of experience acquiring accounting firms. The plaintiff and counter-defendant argue that that this "methodology" is not generally accepted in the field of acquiring accounting firms, that it is not testable and that it has not been subject to peer review and publication. Dkt. No. 46 at 11. They point to the fact that when asked at his deposition if he was "aware of any studies that talk about an ordinary or average loss of revenue when one accounting firm is acquired by another," Sitzberger testified that he looked on the Internet and

22

found an article. Id. at 11-12 (citing Dkt. No. 47-2 at 17-18, Trans. Pages 65 at lines 22-25, 66 and 67 at lines 1-2). They argue that the article—identified in Sitzberger's expert report as "Article 'Know your risk' by Accounting Practice Sales," dkt. no. 47-1 at 111[4]—does not mention Sitzberger's four principles. Id. at 11-12. Finally, they argue that the fact that Sitzberger claims to have successfully acquired twenty accounting firms, despite violating two of his own four principles, shows that the methodology is unreliable.

The defendants respond that under Fed. R. Evid. 702, a method based on the expert's experience can be reliable so long if it is "generally accepted in the profession." Dkt. No. 49 at 6. This understanding is supported by the advisory committee's notes to the 2000 amendment to the Rule 702. The committee noted that "[t]he expert's testimony must be grounded in an accepted body of learning or experience in the expert's field, and the expert must explain how the conclusion is so grounded." Fed. R. Evid. 702, advisory committee's note to 2000 amendment. The defendants point to Sitzberger's testimony that he developed his principles over the past twenty-five years based on his experiences acquiring accounting firms as well as through his conversations with other accountants and learning at seminars. Dkt. No. 49 at 6 (citing Dkt. No. 47-2 at 13).

This is a close call. Sitzberger's principles, or methods, are not the type that one would find reflected in a an "accepted body of learning;" again, he does

---

[4] The plaintiff and counter-defendant identify the article: https://accountingpracticesales.com/buyers/info/know-your-risk/.

not propose to testify to scientific principles that could be tested empirically.

But they are the kinds of ideas that could be grounded in accepted experience

in his field. When asked at his deposition whether counsel could find his four

points or methods of successful client retention anywhere other than in his

own expert report, Sitzberger testified:

> You know, you probably—you probably would. I've kind of—I may have—what I've done over the years is I've talked to other CPA firms bigger than me, five times bigger, ten times bigger, and I asked them how to do things, and I just followed exactly what they said.
>
> So I'm sure that they—you know, I think that the methods that I'm talking about here, complete all work on a timely basis, develop personal relationships with the clients, that's just a very good business practice. Keep all employees including the owners as long as they want at a fixed salary. I'm saying a reasonable fixed salary. That's just good business sense, because as an individual we only have 2200 hours in a year, so we have to do some leverage.
>
> All the clients—you know, if you keep all the clients for one year or 18 months—the reason it's 18 months, because that's usually over two tax seasons. And quite frankly, the clients, they don't want to change accountants. You have the history, you have everything else, and with this two-year period, you create a trust.
>
> And then number—the fourth one is just a normal cash flow, prudent business practice. I think Jack Winter of Winter, Kloman, Moter, Repp told me you don't want to purchase over 25 percent of your current practice because you run into cash flow problems.

Dkt. No. 47-2 at 13, Trans. Pages 46 at lines 21-25, 47, 48 at lines 1-3.

When counsel responded by clarifying that while the methods might be

reported somewhere, Sitzberger learned about them from talking to other

accountants, Sitzberger responded:

> Other accountants, seminars. I've had—I'm 67 years old, and I've probably forgotten where I've gotten all of these ideas, but I have executed on these ideas.

Id. at 13, Trans. Page 48 at lines 4-11.

The court considers Sitzberger's principles to be similar to the insights narcotics officers accrue during years of investigating drug dealers. As the Seventh Circuit explained in Conn, "Courts have looked to the agent's years of experience as well as the number of narcotics cases in which the agent was involved." Conn, 297 F.3d at 556 (citing United States v. Griffith, 118 F.3d 318, 322-23 (7th Cir. 1997); United States v. Hubbard, 61 F.3d 1261, 1274 (7th Cir. 1995); United States v. Cotton, 22 F.3d 182, 185 (8th Cir. 1994)). The Conn court explained, "[i]n these cases, experienced narcotics investigators applied the knowledge gained through years of experience and, essentially, described for the jury what they knew about narcotics dealers." Id.

That is what the defendants propose to do here. They propose to call a person with twenty-five years of experience in acquiring accounting firms, who has acquired twenty such firms, to describe for the jury what he knows about successfully acquiring an accounting firm (retaining clients, billing, etc.). While it is a close call, and while the court would not necessarily call Sitzberger's views a "methodology," the court concludes that Sitzberger may testify about the best practices he has observed from his experience acquiring accounting firms.

The plaintiff and counter-defendant argue that even if the court concludes that Sitzberger's "methodology" was reliable, he erred in applying that "methodology" to the facts of the case (the requirement of Fed. R. Evid. 702(d)). Dkt. No. 46 at 12. They argue that Sitzberger found the facts to fit his

25

opinions. Id. at 12-13. The court disagrees. This is not a circumstance in which Sitzberger twisted data to force it to conform to a desired outcome, like a scientific witness ignores negative test outcomes so that she can force a positive result. Sitzberger was asked to opine whether, based on his experience, the plaintiff and counter-defendant acted in good faith. Sitzberger looked at the information he was given about the plaintiff's actions and he gave that opinion. It makes sense that an expert would have a baseline and would measure facts against that baseline.

The plaintiff and counter-defendant also argue that Sitzberger rendered his opinions using incomplete data. They contend that Sitzberger rendered an opinion without reviewing the tax returns he previously had requested. Dkt. No. 46 at 13. Sitzberger testified at his deposition that he had asked for "some records, tax returns." Dkt. No. 47-2 at 5, Trans. Page 14 at line 8. He stated that he'd asked "if the Hamlin Company had purchased any other practices, this type of thing, and I was only given one—four pages of the most—the tax return prior to the purchase. That's all I was given." Id. at lines 9-12. He stated that he'd asked "numerous times for those things, and . . . never received them," but that because the court had set a December 1 deadline by which he was to finish his report, he'd completed the report without them. Id. at lines 13-17. He stated that he'd been looking for tax years 2012 through 2014 as well as 2015. Id. at Trans. Page 15, lines 8-9. He testified that he wanted to see those documents to determine whether the growth caused by the acquisition put a financial strain on the firm. Id. at lines 13-25.

26

The defendants argue that Sitzberger did not have the documents he needed because the plaintiff refused to provide them, even after this court ordered it to do so. Dkt. No. 49 at 7-8. They assert that if ever the plaintiff turns over the documents, they will provide them to Sitzberger so that he can consider whether they impact his opinions. Id. at 7-8. The defendants are correct that on March 8, 2021, the court entered an order compelling the plaintiff to turn over ten pages of tax information for the tax years 2013 and 2014. Dkt. No. 48. In its reply brief, the plaintiff responded that while it "ha[d] produced tax records" as required by the court's order, "Sitzberger's willingness to issue opinions in this case without tax information he felt was necessary is further indicative of the unreliability of his methodological application." Dkt. No. 53 at 7, n.2.

The plaintiff and counter-defendants' argument is disingenuous. They filed their motion to exclude Sitzbeger on February 25, 2021. Dkt. No. 45. At that time, they had not turned over the 2013 and 2014 tax documents, so they knew Sitzberger could not have considered them even had he wanted to. Sitzberger had been deposed a month or so earlier, in January 2021, so they knew that he'd wanted to see the 2013 and 2014 return information and had asked for it. They knew that the reason he'd completed his report without that information was because of the court's October 1, 2020 scheduling order setting a deadline of December 1, 2020 by which the defendants had to disclose their expert witness report. Dkt. No. 33. For the plaintiff to refuse to turn over the documents, then argue that Sitzberger's failure to factor those

27

documents into his opinion renders application of his methods to the facts of the case unreliable, is, as the court stated above, disingenuous. There is no trial date scheduled. Sitzberger will have the opportunity to review the documents and explain whether they change his opinions.

Finally, the plaintiff and counter-defendant argue that Sitzberger's conclusions about the post-acquisition revenue changes are inaccurate and unreliable because they were based "on the erroneous assumption that the calculations used were an admission by Clay Hamlin." Dkt. No. 46 at 13. One of the documents Sitzberger reviewed in writing his report is a ten-page spreadsheet titled "James Hamlin & Co. P.C. Collections C&S Clients." Dkt. No. 47-1 at 30-39. Sitzberger calls this the "Billing report for Czarnecki & Schlenker, LLC for 6 month periods from 2013 and 2014." Id. at 29. The plaintiff argues that Sitzberger did not understand "the context of the spreadsheets upon which he based his opinion," and asserts that "[t]here is simply no indication that the spreadsheet is what Sitzberger assumed it to be." Dkt. No. 46 at 13. The defendants respond that this is "the same spreadsheet Clay Hamlin used to prepare his own expert report." Dkt. No. 49 at 8. In reply, the plaintiff reiterates that Sitzberger's "presumption" that the spreadsheet represented admissions by Hamlin was "flawed." Dkt. No. 53 at 7.

This argument is frustrating. No one explains who created this spreadsheet, though the defendants say that the document "was created at Clay Hamlin's request" and that he "did not even know the meaning of all the headings." Dkt. No. 49 at 9. The document appears to be a list of the plaintiff's

28

collections from Czarnecki & Schlenker clients between January 1 and June 30 of 2017. The plaintiff and counter-defendant do not explain why Sitzberger should not have relied on this spreadsheet. They do not assert that the information in the spreadsheet was inaccurate. They do not challenge Sitzberger's mathematical calculations. It appears that both Sitzberger and Clay Hamlin relied on this document in reaching their conclusions. If the case goes to trial, the parties will have the opportunity to cross-examine Sitzberger and Hamlin regarding their reliance on this document—what they believed it to be, their beliefs as to the source of the data reflected in the document, who they believed created it.

As for the two ways Sitzberger reached his conclusions—by doing a mathematical calculation based on the numbers reflected in the spreadsheet and by taking the starting number in the spreadsheet and applying his "principles"—both rise or fall on the accuracy of the spreadsheet. If the information in the spreadsheet is inaccurate or flawed, it would behoove the parties to discuss that *now*. The parties already have expended significant time and money in this litigation, with more coming (given that the court is about to hold a hearing on the defendants' *second* motion to compel). For the plaintiff and the counter-defendant to be coy about the authenticity or accuracy of the information in a document upon which both experts relied will lead to further unnecessary litigation and expense for both sides.

3. *Will Sitzberger's testimony be helpful to the trier of fact?*

The issue in the case is whether the actions or practices of the plaintiff and the counter-defendant after the acquisition resulted in the alleged decline in revenue that triggered the contractual reduction in purchase price. The defendants propose to call Sitzberger to testify about whether those actions or practices were performed in good faith and whether (a) the actions were a cause of the reduction in revenue and (b) whether the revenue declined sufficiently to trigger the contractual price reduction. His testimony would be helpful to the trier of fact.

**V.     Conclusion**

The court **DENIES** the plaintiff's motion to exclude the expert testimony of Fred Sitzberger. Dkt. No. 45.

Dated in Milwaukee, Wisconsin this 18th day of October, 2021.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**

30